Gaetano LOMBARDO, Petitioner,

v.

UNITED STATES of America, Respondent.

Nos. 00–8195–CIV, 96–8090–CR.

United States District Court, S.D. Florida.

Oct. 9, 2002.

David Frank Pleasanton, West Palm Beach, FL, for Plaintiff.

Diana L.W. Fernandez, U.S. Atty's Office, Fort Lauderdale, FL, for Defendant.

## ORDER

GONZALEZ, District Judge.

**THIS MATTER** has come before the Court on the Petition to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody Pursuant to 28 U.S.C. § 2255 ("Petition") (Case III, DE # 1)[1], filed by

---

1. The Court will refer to various docket entries of three separate cases in this Order. Each reference or citation to a docket entry will therefore indicate the case in which the entry is docketed. "Case I" refers to *United States v. Rendina*, No. 94 Cr. 6170 (S.D. Fla. filed Aug. 19, 1994); "Case II" refers to Petitioner's underlying criminal case, *United States v. Lombardo*, No. 96 Cr. 8090 (S.D. Fla.

Gaetano Lombardo ("Petitioner"). For the reasons stated herein, the Court **ORDERS AND ADJUDGES** that the Petition is **DENIED.**

## I. Procedural History and Standard of Review.

Petitioner filed the Petition on March 3, 2000, arguing that Petitioner was entitled to relief, under U.S. Const. amend. VI and 28 U.S.C. § 2255, because the representation of his trial defense attorney, John F. O'Donnell ("O'Donnell"), constituted ineffective assistance of counsel on two bases: (1) O'Donnell labored under an actual conflict of interest that adversely affected his representation of Petitioner; and (2) O'Donnell failed to reduce to writing an oral agreement regarding Petitioner's sentence allegedly reached between O'Donnell and the Government. *See* Petition at 3–4. The Court referred the matter to Magistrate Judge Snow (Case III, DE # 3) on March 9, 2000, and the matter was subsequently reassigned to Magistrate Judge Vitunac (Case III, DE # 12) on August 16, 2000. On August 25, 2000, Petitioner filed a motion to amend the Petition (Case III, DE # 15), adding a third basis for relief. There, in the wake of the United States Supreme Court's decision in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), Petitioner argued that O'Donnell afforded Petitioner ineffective assistance of counsel by failing to argue during Petitioner's sentencing that Petitioner's sentence ought not be enhanced on account of conduct not charged in the indictment.

On August 31, 2001, Magistrate Judge Vitunac, after conducting evidentiary hearings and receiving oral and written argument, issued a Report and Recommendation ("R & R") (Case III, DE # 42), recommending that the Petition for relief

be granted on only one of Petitioner's three argued bases: that Petitioner's counsel, O'Donnell, labored under an actual conflict of interest that adversely affected his representation of Petitioner. *See* R & R at 11–15. On December 20, 2001, the Government filed its objections (Case III, DE # 45) to the R & R, challenging that portion of the R & R that recommended that this Court grant Petitioner relief. Petitioner filed no objections to the R & R.

Title 28, section 636, provides that district courts "shall make a *de novo* determination of those portions of the report ... to which objection is made." 28 U.S.C. § 636(b)(1); *Diaz v. United States,* 930 F.2d 832, 836 (11th Cir.1991). The Eleventh Circuit has stated that, "[a]s the use of the phrase *de novo* implies, the district court's consideration of the factual issue must be independent and based upon the record before the court." *LoConte v. Dugger,* 847 F.2d 745, 750 (11th Cir.1988), *cert. denied,* 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988). And, "to the extent the magistrate has made findings of fact based upon the testimony of the witnesses heard before the magistrate, the district court is obligated to review the transcript ... of those proceedings." *Id.* District courts "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). District courts in the Eleventh Circuit have reviewed those portions of a magistrate's report and recommendation to which no objection has been made for clear error. *See, e.g., Miller v. Singletary,* 958 F.Supp. 572, 573 (M.D.Fla. 1997) (citing *Gropp v. United Airlines, Inc.,* 817 F.Supp. 1558, 1562 (M.D.Fla. 1993)).

filed Sept. 12, 1996); "Case III" refers to the instant case, *Lombardo v. United States,* No.

00 Civ. 8195 (S.D. Fla. filed March 3, 2000).

This Court has thoroughly reviewed the entire record before it under the applicable standards of review. The Court adopts in whole that portion of the R & R that recommended denying the Petition to the extent it was premised on the grounds that Petitioner's counsel failed to reduce to writing an alleged oral agreement regarding Petitioner's sentence between Petitioner's counsel and the Government. *See* R & R at 15–16. The Court also adopts in whole that portion of the R & R recommending that the Petition be denied to the extent it was premised on the Supreme Court's decision in *Apprendi*.[2] *See* R & R at 16–19.

For the reasons stated herein, however, the Court rejects that portion of the R & R recommending that Petitioner be granted relief because his trial defense attorney, O'Donnell, labored under an actual conflict of interest that adversely affected his representation of Petitioner. The facts of this case that bear on this issue are complex, messy and not easily discerned from the record. The relevant law presents challenges to the analysis as well. The Court will therefore attempt to elucidate both the facts and the law of this matter as precisely as possible.

## II. Background.

### A. O'Donnell's Relationship with Richard F. Rendina.

This matter hinges upon the relationship between Petitioner's trial counsel, O'Donnell, and Richard F. Rendina ("Rendina"). Rendina is a disbarred Florida lawyer who spent several years working as an Assistant State Attorney for Broward County, Florida, before entering private practice in the early 1980s. While in private practice Rendina did, among other things, criminal

defense work. The record is clear that, since the early 1980s, O'Donnell and Rendina have been close personal and professional friends. *See, inter alia,* October 2, 2000 Hr'g Tr. ("Hr'g Tr. I") (Case III, DE # 30) at 14–17; October 3, 2000 Hr'g Tr. ("Hr'g Tr. II") (Case III, DE # 26) at 62–63. They socialized together; they and their respective families have vacationed together; the two golfed together; and, while Rendina was still a member of the bar, they shared office space with, and referred cases to, one another. *See Id.* O'Donnell has characterized Rendina as "more or less extended family." Hr'g Tr. I at 17. In addition, after Rendina was disbarred in 1991, O'Donnell employed him to do paralegal work on certain discrete matters. *See* Hr'g Tr. I at 17. Most important, however, for the analysis here, O'Donnell and Rendina consistently discussed Rendina's various legal problems, and O'Donnell consistently gave Rendina advice about the same. *See* Hr'g Tr. I at 16.

### B. Rendina's Involvement in the Events Leading to Petitioner's Arrest.

Rendina has had several legal problems over the years. *See* Hr'g Tr. I at 16; Hr'g Tr. II at 44. One of them materialized on August 19, 1994, when a one-count information was filed against Rendina for making a false statement on his federal income tax return. *See* Case I, DE # 1. Rendina pled guilty to the information on October 7, 1994. *See* Case I, DE # 8. On April 17, 1995, Rendina was sentenced to eight months of imprisonment and one year of supervised release. *See* Case I, DE # 17. On June 9, 1995, Rendina was released

---

**2.** The Court notes that, subsequent to Magistrate Judge Vitunac's issuance of the R & R, the Eleventh Circuit vindicated her determination that the new constitutional rule of criminal procedure announced in *Apprendi* does not apply retroactively on collateral review. *See McCoy v. United States,* 266 F.3d 1245, 1258 (11th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 2362, 153 L.Ed.2d 183 (2002).

from federal custody on bond pending an appeal of his sentence. *See* Case I, DE # 46.

After being out on appellate bond for approximately a year, Rendina was contacted in the summer of 1996 by a former client, and co-defendant, of Rendina named Peter Roussonicolos ("Roussonicolos"). While engaged in law practice, Rendina had represented Roussonicolos in various criminal matters. *See* Hr'g Tr. II at 44. Rendina had also been indicted as a co-defendant with Roussonicolos, and others, in a drug-related case. *See* Hr'g Tr. II at 44–45. In the early summer of 1996, Roussonicolos told Rendina that two men with whom Roussonicolos was acquainted had expressed to Roussonicolos that they would be interested in purchasing cocaine. *See* Hr'g Tr. II at 45, 92. The two men had also expressed to Roussonicolos an interest in investing in a legitimate gaming venture Rendina and others were attempting to establish in the Republic of Panama. *See* Hr'g Tr. II at 44. The two men about whom Roussonicolos was speaking were Petitioner, Gaetano Lombardo, and Petitioner's cousin, Franco Lombardo.

Rendina and Roussonicolos discussed what they could do with this information. Rendina suggested that he and Roussonicolos contact Roberto Collazo ("Collazo")— who, in addition to being involved in the stagnating Panamanian gaming venture with Rendina, was also known by Rendina to be a paid confidential informant, or "CI", for the Drug Enforcement Administration. *See* Hr'g Tr. II at 45–46. Rendina knew Collazo was a paid CI both from conversations with Collazo himself, and

from discussions with Rendina's cousin, Michael Rendina, a former DEA agent.

Rendina's motives for suggesting he and Roussonicolos contact Collazo were many; civic virtue was not among them. Knowing that Collazo was a paid CI, Rendina reckoned that, if Collazo passed the information onto the Government and an arrest or a conviction materialized from it, Collazo, for whom Rendina had fronted investment money in the Panamanian gaming venture, could earn thousands of dollars.[3] *See* Hr'g Tr. II at 46. Rendina also hoped that, if the information led to an arrest or a conviction, Rendina would be able to persuade the DEA to speak to the Assistant United States Attorney ("AUSA") handling Rendina's pending tax-related criminal case, and convince the AUSA to file a motion to reduce Rendina's sentence. *See Id.* Rendina therefore hoped that passing the information onto the Government through Collazo would position Rendina both to recoup a portion of his investment in the Panamanian gaming venture and receive a sentence reduction in his tax case.

Rendina and Roussonicolos contacted Collazo, who in turn contacted the DEA and arranged for Rendina, Roussonicolos, Collazo and DEA Special Agents Brett Scott ("Scott") and Louis Perez to meet at the Fort Lauderdale Airport in mid-July 1996. *See* Hr'g Tr. II at 91–92. At this meeting, Collazo introduced Roussonicolos and Rendina to the DEA agents, and Roussonicolos and Rendina informed the agents that they knew of two persons who might be interested in purchasing a large quantity of cocaine. *See* Hr'g Tr. II at 94–101. Roussonicolos and Rendina were ad-

---

**3.** One method of payment for CI's is for the Government to give him or her a percentage of money seized during a so-called "reverse sting" operation. In a reverse sting, the Government arranges a mock sale of drugs between a willing purchaser, who is the target of the sting, and Government agents. Thus, for example, if the target of an investigation were to bring $250,000 to the mock drug-deal, the Government would pay the informant a percentage, sometimes up to 25%, of the money seized.

amant that they did not want to be CI's for the DEA and did not want to be involved in a subsequent investigation, if any, of the two individuals. *See Id.* Rendina did, however, tell the DEA agents that he had a "legal problem", and asked them whether, if the information led to a positive outcome for the Government, Rendina could benefit from his involvement. *See Id.* The agents indicated that, while such considerations were quite distant given the then present circumstances, they would be willing to speak to an AUSA on Rendina's behalf in the event that the information did in fact lead to a positive outcome for the Government. *See Id.* Thus transpired Roussonicolos's and Rendina's only meeting with the DEA.

While the record is not entirely clear on this point, it appears to the Court that—without the direction or involvement of the DEA and without a recording device of any kind—Roussonicolos and Rendina met with Petitioner and Franco Lombardo shortly after their meeting with the DEA agents at the Fort Lauderdale Airport. *See* Hr'g Tr. II at 52, 103–04. Roussonicolos introduced Rendina to the Lombardos as somebody who had contacts with potential suppliers of cocaine. *See* Hr'g Tr. II at 47–51. The meeting lasted only five to ten minutes, during which time the Petitioner and Franco Lombardo, without hesitation, expressed their interest in purchasing cocaine; Rendina and the Lombardos also discussed the Panamanian gaming venture. *Id.* Rendina represented to the Lombardos that a contact of Rendina's—a role ultimately played by Collazo—would contact the Lombardos regarding a cocaine transaction. *Id.* Thus transpired Rendina's only meeting with the Lombardos.

After this meeting between and among Roussonicolos, Rendina, Petitioner and Franco Lombardo, Collazo was informed that the meeting had occurred. *See* October 20, 2000 Hr'g Tr. ("Hr'g Tr. III") (Case III, DE # 31) at 40. Collazo then contacted the DEA, and on July 22, 1996, the DEA met with Collazo to debrief him regarding the information he possessed about Petitioner and Franco Lombardo. *See* Hr'g Tr. II at 95–96. On July 23, 1996—under DEA supervision and surveillance, and wearing a recording device— Collazo met with the Lombardos for the first time, posing as the person Rendina had told the Lombardos would be contacting them. *See* Trial Tr. (Case II, DE # 184) at 229–30. From that first meeting between Collazo and the Lombardos until the arrest of the Lombardos in a reverse sting on September 11, 1996, Collazo, working with the DEA, met with the Lombardos on multiple occasions to further the operation. After informing Collazo of their only meeting with the Lombardos, neither Roussonicolos nor Rendina had any further involvement in the investigation that led to the arrest of the Lombardos. *See* Hr'g Tr. II at 97–99.

On September 19, 1996, Petitioner, Franco Lombardo, and a third defendant were charged in a two-count indictment with conspiracy, and attempt, to possess with the intent to distribute cocaine in violation of 21 U.S.C. § 846.[4] Several attorneys appeared on Petitioner's behalf between the date of his arrest and February 1997. In February 1997 Petitioner engaged O'Donnell to represent Petitioner at trial.

### C. Events Leading up to Petitioner's Trial.

Either before O'Donnell began representing Petitioner or soon thereafter, O'Donnell learned through his personal relationship with Rendina that Rendina had

---

4. The third defendant's case was severed from that of the Lombardos, and the Court, during the trial of the Lombardos, declared a mistrial as to Franco Lombardo.

been involved in the events that led to Petitioner's arrest. *See* Hr'g Tr. I at 67–68. O'Donnell advised Petitioner of his close personal relationship with Rendina, and O'Donnell and Petitioner discussed the relationship on many occasions throughout the course of the representation. *See* Hr'g Tr. I at 24, 50. Petitioner never expressed concern to O'Donnell about O'Donnell's relationship with Rendina. *See* Hr'g Tr. I at 50.

Upon a stipulation signed by Petitioner, one of Petitioner's previous attorneys, and O'Donnell (Case II, DE # 67), this Court signed an order on February 27, 1997, substituting O'Donnell as counsel for Petitioner in Petitioner's case (Case II, DE # 68). Around the same time, the AUSA prosecuting Petitioner's case, Ms. Diana Fernandez ("Fernandez"), learned of O'Donnell's relationship with Rendina from Special Agent Scott, who had been advised of the O'Donnell–Rendina relationship by Collazo. *See* Hr'g Tr. III at 23, 48–49.

The relationship between O'Donnell and Rendina was first brought to this Court's attention in this case during a calender call on February 28, 1997. Consistent with normal practice, Petitioner was not present at the calender call. At that time, Fernandez and O'Donnell raised the O'Donnell–Rendina relationship with this Court. *See* May 28, 1997 Hr'g Tr. (Case II, DE # 92) at 35–41; Hr'g Tr. I at 57; Hr'g Tr. III at 51–52. O'Donnell advised this Court that he and Rendina were close personal friends and that O'Donnell had employed Rendina to do paralegal work for O'Donnell after Rendina's disbarment. *See Id.* Fernandez and O'Donnell advised the Court that Rendina had introduced Collazo to Petitioner at the outset of the investigation that led to Petitioner's arrest. *See* Hr'g Tr. III at 51–52, 68–72. Fernandez indicated that, at that time, the Government had no intention to call Rendina as a witness in the case; O'Donnell indicat-

ed that he did not believe he would call Rendina either. *See Id.* Based on the facts presented to this Court—*i.e.*, that O'Donnell was a close, personal friend and occasional short-term employer of an unlikely, if potential, witness in the case—this Court determined that there was no reasonable probability that O'Donnell would labor under an actual conflict of interest that would adversely affect his representation of Petitioner.

Between the February 1997 calender call and the December 1997 trial of Petitioner, several relevant events transpired. Given the nature of the evidence against Petitioner—in particular, the recorded conversations of Petitioner openly discussing a cocaine transaction with Collazo—O'Donnell concluded that the only available theory of defense he could argue for his client was one of entrapment. *See* Hr'g Tr. I at 20, 45–47. O'Donnell determined that he would argue that Collazo and Rendina had grave credibility problems and stood to gain substantially from an arrest of Petitioner: Collazo, from being a paid CI; and Rendina, from receiving both a cut of the spoils from Collazo and, potentially, a reduction in his sentence. *See* Hr'g Tr. I at 45–50. O'Donnell also resolved to argue that Rendina and Collazo had enticed Petitioner into the cocaine transaction by holding out to Petitioner the legitimate Panamanian gaming venture as an investment opportunity. *See Id.*

During his preparation for Petitioner's trial, O'Donnell telephonically interviewed Rendina on multiple occasions. *See Id.* Rendina unambiguously advised O'Donnell that, if he were called as a witness, his testimony would undermine an entrapment defense; Rendina stated that his testimony would "bury" Petitioner. *See* Hr'g Tr. I at 47. Rendina told O'Donnell that, in his one meeting with the Lombardos and Roussonicolos in July 1996, Petitioner and

Rendina had frankly discussed a cocaine transaction. *See* Hr'g Tr. I at 48. O'Donnell likewise contacted Roussonicolos, who also indicated that his testimony would not be helpful to Petitioner. *See* Hr'g Tr. I at 49–50. O'Donnell therefore determined that calling either Rendina or Roussonicolos as a witness would elicit testimony that would eviscerate Petitioner's one colorable theory of defense. O'Donnell therefore resolved instead to elicit testimony in support of the entrapment defense from the Government's witnesses, such as Collazo and the DEA agents, on cross-examination and argue the entrapment defense inferentially. *See* Hr'g Tr. I at 48–49. O'Donnell testified during the evidentiary hearing regarding the Petition that he would have called Rendina as a witness if Rendina had indicated to O'Donnell that Rendina had in fact used the possibility of investing in the Panamanian gaming venture to entice Lombardo to engage in a drug transaction. *See Id.*

Meanwhile, Rendina did receive some consideration from the Government for his involvement in the events that led to Petitioner's arrest. After Petitioner's arrest in September 1996, Collazo contacted Special Agent Scott, and asked Scott, on Rendina's behalf, to contact the AUSA working on Rendina's tax case. *See* Hr'g Tr. III at 22. Special Agent Scott did so, contacting AUSA Scott Behnke ("Behnke"), and advising Behnke that Rendina had helped to introduce Collazo to Petitioner. *See Id.* Behnke confirmed Special Agent Scott's information with Fernandez, and on May 28, 1997, the Government filed a motion (Case I, DE # 72) pursuant to Fed. R.Crim.P. 35, requesting that the court in which Rendina's tax case was pending reduce Rendina's sentence. Rendina's involvement in introducing Collazo to the Lombardos formed only part of the basis for the Government's Rule 35 motion in Rendina's tax case; the motion was also premised upon Rendina's testifying for the Government in another criminal case, which was otherwise wholly unrelated to the instant matter. *See* November 28, 2000 Hr'g Tr. (Case III, DE # 34) at 3–8. The Rule 35 motion was denied, however, and Rendina's sentence was not reduced.

### D. O'Donnell's Representation of Petitioner at Trial.

This Court conducted Petitioner's trial in December 1997. O'Donnell, through cross examination of the Government's witnesses, endeavored to elicit testimony in support of an entrapment defense without calling Rendina or Roussonicolos as witnesses. Through cross-examination of the Government's witnesses, O'Donnell attempted to elicit, and in some instances did elicit, testimony regarding all of the following: Collazo's fulsome criminal history, his experience as a paid CI for the Government, and, most important for the instant case, Collazo's relationship with Rendina; that Collazo would be giving to Rendina a portion of the money the Government paid Collazo due to the arrest of Petitioner; that Collazo and Rendina were involved in the Panamanian gaming venture together, and that Rendina wanted to generate additional capital for it; that Rendina had recently lost substantial money in the stock market; that Rendina was a disbarred lawyer; that Rendina had a drug conviction from a case in which Rendina and Roussonicolos were co-defendants; that Rendina was, at the time of the investigation of Petitioner, on appellate bond and potentially had months of prison ahead of him for a tax-related conviction; that Rendina wanted to set up the Lombardos to try to earn a reduction in his pending prison sentence; that Rendina asked the DEA agents if they would speak to the prosecutor in his tax-related case if Rendina's involvement led to an arrest or conviction; that Rendina had met with the Lombardos, without DEA surveillance or

recording, prior to Collazo's July 23, 1996 meeting with them; that Rendina had discussed the Panamanian gaming venture with the Lombardos; and that Rendina was Collazo's only connection to the Lombardos. *See* December 11, 1997 Trial Tr. (Case II, DE # 185) at 437–60; December 15, 1997 Trial Tr. (Case II, DE # 186) at 534–37, 570–72; December 16, 1997 Trial Tr. (Case II, DE # 187) at 932–45.

Despite O'Donnell's efforts, after the Government's case-in-chief was completed and upon O'Donnell's motion, this Court ruled that, at that point in the trial, there was insufficient evidence in the record from which a reasonable jury could infer either that the Government had improperly induced Petitioner to commit the offense with which he was charged, or that the Petitioner had no predisposition to commit the offense. The Court therefore denied at that time O'Donnell's motion for a ruling on whether the Court would give an instruction to the jury regarding entrapment. Petitioner thereafter testified in his own defense, and O'Donnell called Collazo as a witness for the defense to attempt to elicit, again, testimony that would support an entrapment defense. After O'Donnell presented Petitioner's case, the Court granted O'Donnell's renewed motion for an instruction on entrapment. The jury, nevertheless, convicted Petitioner on both counts of the indictment, returning its verdict on December 17, 1997.

### E. O'Donnell's Involvement in Rendina's Tax Case.

Petitioner was sentenced in May 1998. O'Donnell continued to represent Petitioner through the May 1998 sentencing; Petitioner's current counsel, David F. Pleasanton, took over Petitioner's representation soon thereafter, entering a notice of appearance for Petitioner on May 29, 1998.

O'Donnell had been discussing Rendina's tax case with Rendina throughout its pendency. Rendina had even referred to such consultations in an affidavit signed by Rendina and appended to a May 1995 motion (Case I, DE # 38) in his tax case. This May 1995 motion, while including a reference to O'Donnell by name in the affidavit appended thereto, was nevertheless signed by Rendina's counsel of record in the tax case. In addition, after Petitioner's conviction and before Petitioner's sentencing—though he never entered a notice of appearance on behalf of Rendina in Rendina's still-pending tax case, or in any other Rendina case, for that matter—O'Donnell did sign three pleadings filed in Rendina's tax case.

On February 5, 1998, and again on April 23, 1998, respectively, O'Donnell signed motions (Case I, DE # 80, 82) seeking permission for Rendina, who was on supervised release at the time, to travel outside of the United States. Also on April 23, 1998, O'Donnell signed a motion (Case I, DE # 83) seeking early termination of Rendina's one-year term of supervised release. The memorandum in support of the motion states, in part, as follows:

> In addition, Rendina has cooperated with the United States Attorney's office in connection with two cases, *United States v. Franco Nicolleti*, Case Number 96–6199–HURLEY and *United States v. Franco Lombardo*, Case Number 96–8090–CR–GONZALEZ, for which he has *not received any credit from this Court* with respect to any adjustment in his sentence.[5]

The motion to terminate Rendina's supervised release was nevertheless denied.

When O'Donnell was questioned about the pleadings signed by him that were

---

5. The motion refers to *"United States v. Franco Lombardo"*, but the case number given—which is that of "Case II" in this Order, No. 96 Cr 8090—makes plain that O'Donnell was referring to the case of Petitioner, Gaetano Lombardo, and Franco Lombardo.

filed in Rendina's tax case, during the evidentiary hearing held regarding the instant Petition, O'Donnell stated that he thought signing them constituted attorney-client representation. *See* Hr'g Tr. I at 30–32, 44–45. When questioned about the motion to terminate Rendina's supervised release, O'Donnell—based on the pleading itself, which was presented to him as an exhibit in the hearing—stated that he had "apparently" used Rendina's involvement in the investigation of Petitioner, who was still O'Donnell's client at the time, to argue for the early termination of Rendina's supervised release term. *See* Hr'g Tr. I at 30–32

Rendina was also questioned about the pleadings filed in his tax case that were signed by O'Donnell. Rendina testified that—while he had discussed his tax case with O'Donnell, as he had discussed with O'Donnell all of his sundry legal problems over the years—Rendina had never retained O'Donnell, O'Donnell had never filed a notice of appearance on Rendina's behalf, and, most important, he has never considered his relationship with O'Donnell to be an attorney-client relationship. *See* Hr'g Tr. II at 41, 64–69. Rendina also stated that, to the extent O'Donnell's signature appeared in documents filed in Rendina's tax case, O'Donnell may have signed them as a personal favor to Rendina and at the direction of Rendina's retained counsel of record in that case. *See* Hr'g Tr. II at 64–69.

### F. Petitioner's Argument Regarding O'Donnell's Conflict of Interest and the Magistrate's Findings.

The Petitioner argues, in essence, that O'Donnell labored under an actual conflict of interest in Petitioner's case because of the following: O'Donnell was a close personal friend of Rendina; O'Donnell represented Rendina in Rendina's tax case prior to, and concurrently with, his representation of Petitioner; Rendina was a potential witness in the case whose testimony could have established Petitioner's entrapment defense; O'Donnell did not call Rendina as a witness to ensure (1) that O'Donnell would not need to destroy his friend's credibility and reputation if Rendina became adverse while testifying and to ensure (2) that a poor performance by Rendina on the stand would not undercut Rendina's ability to use his involvement in Petitioner's case to argue for favorable treatment in his tax case. Petitioner argues, in essence, that this actual conflict adversely affected O'Donnell's representation of Petitioner because O'Donnell was unable to win an entrapment instruction without calling the Petitioner to testify.

Magistrate Judge Vitunac found that, under the totality of the circumstances of this case, O'Donnell labored under an actual conflict of interest due to his close, personal relationship with Rendina, who had a personal interest in the arrest and prosecution of Petitioner. *See* R & R at 12–13. Magistrate Judge Vitunac also found that this conflict of interest adversely affected O'Donnell's representation of Petitioner because O'Donnell turned away from an alternative defense tactic—*i.e.*, calling Rendina as a witness on entrapment—to avoid a scenario in which a poor performance by Rendina on the stand, from the Government's perspective, would have jeopardized any consideration Rendina hoped to receive from the Government in his tax case. *See Id.* at 14–15.

### III. Law and Analysis.

Before the Court addresses the particular, complex issues of fact and law presented by this case, a genealogy of the Supreme Court and Eleventh Circuit law applicable to the Petition is in order. An explication of the law applicable to a petition for a writ of habeas corpus premised on the petitioner having allegedly received

ineffective assistance of counsel under the Sixth Amendment must begin, analytically if not chronologically, with the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There, the Supreme Court ruled that, in order for a petitioner to show that the extraordinary relief of the writ is warranted due to ineffective assistance of counsel, a petitioner must demonstrate (1) that the defense counsel's representation fell below an objective standard of reasonableness, and (2) that the deficient representation prejudiced the petitioner's defense, that is, but for counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88, 694, 104 S.Ct. 2052.

There is, however, an exception to this general rule. The Supreme Court has recently noted that, historically, where assistance of counsel has been denied entirely or during a critical stage of a proceeding, the Supreme Court has "spared the defendant the need of showing probable effect upon the outcome" because under such circumstances "the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary." *Mickens v. Taylor*, —— U.S. ——, 122 S.Ct. 1237, 1241–42, 152 L.Ed.2d 291 (2002) (citing, *inter alia*, *United States v. Cronic*, 466 U.S. 648, 658–59, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)).

One instance of such exceptional circumstances was addressed by the Supreme Court in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), a case that predated, and was cited approvingly by, the Supreme Court's decision in *Strickland*. The petitioner in *Sullivan*, John Sullivan ("Sullivan"), was indicted together with two co-defendants for multiple first-degree murders. *Sullivan*, 446 U.S. at 337, 100 S.Ct. 1708. Two privately retained counsel represented all three separately-tried defendants in their respective trials. *Id.* at 338, 100 S.Ct. 1708. Sullivan was tried first, temporally speaking, and convicted of first-degree murder; Sullivan's co-defendants were each acquitted of the charges in their later trials. *Id.* Neither Sullivan nor his counsel objected to the joint, concurrent representation at any time. *Id.*

Sullivan subsequently sought collateral relief, claiming that his counsel had labored under a conflict of interest. Sullivan cited, among other things, evidentiary hearing testimony of one of his former lawyers that Sullivan's counsel had rested Sullivan's defense after the prosecution presented its case-in-chief, because counsel did not want to expose to the prosecution defense witnesses counsel intended to call in the upcoming trials of Sullivan's co-defendants. *Id.* at 338–39, 100 S.Ct. 1708. The Supreme Court articulated two distinct but related rules in *Sullivan*: (1) a trial court need not initiate an inquiry into the propriety of a joint, concurrent representation when neither client nor counsel object thereto, and the court neither knows nor reasonably should know that a particular conflict of interest exists; and (2) "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected the lawyer's performance." *Sullivan*, 446 U.S. at 348–49, 100 S.Ct. 1708. On this second point, the Supreme Court continued, stating that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief ... [b]ut until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Id.* at 349–50, 100 S.Ct. 1708. (citations omitted). The Su-

preme Court concluded on the facts of *Sullivan* that "the Sixth Amendment imposed upon the trial court no affirmative duty to inquire into the propriety of multiple representation," *Sullivan*, 446 U.S. at 348, 100 S.Ct. 1708, but remanded the case for further proceedings regarding whether petitioner's counsel had labored under an actual conflict of interest that adversely affected counsel's representation. *Id.* at 350, 100 S.Ct. 1708.

■ The Eleventh Circuit has elaborated upon the Supreme Court's decision in *Sullivan* in the intervening twenty-two years, developing the contemporary legal edifice under which this Court must analyze the instant Petition. The Eleventh Circuit laid the first blocks of this edifice in *Porter v. Wainwright*, 805 F.2d 930 (11th Cir.1986), *cert. denied sub nom., Porter v. Dugger*, 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 682 (1987).

The petitioner in *Porter v. Wainwright*, Raliegh Porter ("Porter"), was convicted on two counts of premeditated murder. *Porter*, 805 F.2d at 931. While in pre-trial detention, Porter allegedly admitted to committing the murders with which he was charged to a fellow prisoner, Matha Thomas ("Thomas"). *Id.* at 939. Porter's appointed counsel, an assistant public defender named Stephen Widmeyer ("Widmeyer"), was assigned to represent Porter on August 23, 1978. *Id.* At that time, Widmeyer also represented, on wholly unrelated charges, Thomas, the prisoner to whom Porter allegedly confessed. *Id.* On September 1, 1978, Widmeyer negotiated a bond reduction for Thomas and then filed a motion to withdraw from his representation of Thomas, which was granted on September 5, 1978. *Id.* Thomas testified at Porter's trial against Porter, and Widmeyer cross-examined Thomas, his former client. *Id.* Porter was never advised that Widmeyer had formerly represented Thomas and therefore had no opportunity to object to Widmeyer's representation. *Id.*

Porter argued in his petition for habeas corpus, among other things, that Widmeyer labored under a conflict of interest because Widmeyer owed a continuing duty to Thomas that prevented Widmeyer from cross-examining Thomas as vigorously as possible. *Id.* Porter specifically argued that Widmeyer was forced to choose between impugning his former client with confidential communications, on the one hand, and forgoing vigorous cross-examination to preserve Thomas's attorney client-privilege, on the other. *Id.* Regarding the adverse effect upon Widmeyer's representation of Porter resulting from the alleged conflict, Porter argued that an attorney other than Widmeyer could have cross-examined Thomas about Thomas's bond reduction, and about a possible agreement reached between Thomas and the prosecution for Thomas's testimony against Porter. *Porter*, 805 F.2d at 940. The Eleventh Circuit—citing, *inter alia, Sullivan*—stated that Porter's allegations, if true, would be sufficient to establish that an actual conflict of interest had adversely affected Widmeyer's representation of Porter; the Eleventh Circuit therefore remanded the case for an evidentiary hearing on those issues. *Id.* In *Porter*, therefore, the Eleventh Circuit extended the application of the rules announced by the Supreme Court in *Sullivan*—a case involving the joint, concurrent representation of separately tried, co-defendants—to a case involving the successive, if briefly overlapping, representations of a defendant and a prosecution witness, on wholly unrelated charges.

In *Smith v. White*, 815 F.2d 1401 (11th Cir.1987), *cert. denied*, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987), the Eleventh Circuit further elaborated upon the principles implicit in its decision in *Porter*.

The petitioner in *Smith v. White*, Willie Morris Smith ("Smith"), was convicted in two separate jury trials: once for assault with intent to murder and once for robbery. *Smith*, 815 F.2d at 1403. Smith confessed that he had acquired the rifle used in the crimes with which he was charged during an unrelated burglary that he had committed with a friend, John Cotton ("Cotton"). *Id.* Cotton testified for the prosecution at both of Smith's trials that he had seen Smith in possession of the rifle. *Id.*

In support of his habeas petition, Smith pointed to evidentiary hearing testimony that Smith's counsel, Tom Payne ("Payne"), had represented Cotton on an unrelated marijuana charge as late as December 18, 1975. *Id.* at 1405. Payne was not appointed to represent Smith until March 19, 1976. *Id.* Smith argued that Payne's earlier representation of Cotton adversely affected Smith's defense because, as Smith's co-burglar of the rifle used in the crimes with which Smith was charged, Cotton was the most likely other suspect to have committed the crimes. *Id.* at 1404.

Addressing Smith's petition, the Eleventh Circuit first noted that Smith must show an actual conflict of interest that adversely affected his representation. *Id.* (citing, *inter alia, Strickland, Sullivan,* and *Porter*) The Eleventh Circuit then stated the following:

> We will not find an actual conflict of interest unless appellants can point to specific instances in the record to suggest an actual conflict or impairment of their interests ... Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the

other. If he did not make such a choice, the conflict remained hypothetical.

*Smith*, 815 F.2d at 1405 (quoting *Barham v. United States*, 724 F.2d 1529, 1532 (11th Cir.1984), cert. denied, 467 U.S. 1230, 104 S.Ct. 2687, 81 L.Ed.2d 882 (1984) and citing, *inter alia, Porter*).

Noting that Payne's representations of Smith and Cotton never temporally overlapped, the Eleventh Circuit stated that "[w]e therefore treat this case as one of successive representation rather than simultaneous representation. Of course, the absence of simultaneous representation is not determinative. In some circumstances, a defense lawyer's prior representation of a witness can give rise to an actual conflict of interest." *Smith*, 815 F.2d at 1405 (citing, *inter alia, Porter*). The Eleventh Circuit continued, stating the following:

> This circuit's test for actual conflict—applicable to both successive and simultaneous representation—requires a showing of "inconsistent interests." We hold that in a successive representation case, mere proof that a criminal defendant's counsel previously represented a witness is insufficient to establish "inconsistent interests." In such a context, if defendant fails to show that either (1) counsel's earlier representation of the witness was substantially and particularly related to counsel's later representation of defendant, or (2) counsel actually learned particular confidential information during the prior representation of the witness that was relevant to defendant's later case, then defendant has not come even close to showing "inconsistent interests." We do not imply that proof of either substantial relationship or receipt of relevant confidential information or both would be enough to demonstrate "inconsistent interests" in a successive representation case. We merely hold

that Smith has failed to show "inconsistent interests" in this case where he has failed to adduce proof of substantial relationship or relevant confidential information or any other proof of inconsistent interests. *Smith*, 815 F.2d at 1405–06. The Eleventh Circuit therefore affirmed the district court's denial of habeas relief for Smith. *Id.*

In *Freund v. Butterworth*, 165 F.3d 839 (11th Cir.1999) (en banc), *cert. denied*, 528 U.S. 817, 120 S.Ct. 57, 145 L.Ed.2d 50 (1999), the Eleventh Circuit again elaborated upon its understanding of *Sullivan* as articulated in *Smith*. The petitioner in *Freund v. Butterworth*, John Freund ("Freund"), was convicted of first-degree murder. *Freund*, 165 F.3d at 841. In his habeas corpus petition, Freund argued that his defense counsel, two retained attorneys in a firm, had labored under an actual conflict of interest that adversely affected their representation of Freund because—prior to commencing their representation of Freund, over the course of thirteen years, and in unrelated criminal matters—the two attorneys had represented a separately-tried, non-testifying co-defendant of Freund named John Trent ("Trent"). *Id.* at 841. Freund's counsel had also briefly represented, on an unrelated drug charge, a prosecution witness against Freund named Eleanor Mills ("Mills"). *Id.* at 846.

In *Freund*, the Eleventh Circuit described *Sullivan* as requiring a petitioner to demonstrate two distinct elements in order to establish entitlement to habeas relief: (1) an actual conflict of interest that (2) adversely affected the petitioner's representation. *See Freund*, 165 F.3d at 858 (citing *Sullivan*, 446 U.S. at 350, 100 S.Ct. 1708). The Eleventh Circuit then declared that, "[w]e hold and reaffirm that *Smith* articulates this circuit's test for proving an 'actual conflict' in the successive represen-

tation context." *Freund*, 165 F.3d at 859 (citing *Smith*, 815 F.2d at 1405–06). The Eleventh Circuit clarified that, "[a]n 'actual conflict' occurs when a lawyer has 'inconsistent interests' " and that, "[i]n order to prove that an 'actual conflict' hindered petitioner's lawyer's performance, petitioner 'must make a factual showing of inconsistent interests' or point to 'specific instances in the record to suggest an actual impairment of his or her interests.' " *Freund*, 165 F.3d at 859 (quoting *Smith*, 815 F.2d at 1404–05). The *Freund* court continued, "at a minimum, petitioner must show" either (1) substantial relatedness between the successive representations or (2) the learning of relevant confidential information in the prior representation, but even proof of both "may not necessarily be enough to demonstrate 'inconsistent interests' in a successive representation case." *See Id.; see also, supra* at 1380. The Eleventh Circuit further clarified that, "once the former client, petitioner, proves that the subject matters of the present and prior representations are 'substantially related,' the court will irrebuttably [sic] presume that relevant information was disclosed during the former period of representation." *See Id.* (citations omitted).

Regarding what the Eleventh Circuit termed *Sullivan*'s "adverse effect prong," the *Freund* court stated that the rule in the Eleventh Circuit is and continues to be as follows:

> To prove adverse effect, a habeas petitioner must satisfy three elements. First, he must point to "some plausible alternative defense strategy or tactic that might have been pursued." Second, he must demonstrate that the alternative strategy or tactic was reasonable under the facts.... Finally, he must show some link between the actual conflict and the decision to forgo the alternative strategy of defense. In other

words, "he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."

*Freund*, 165 F.3d at 860 (internal citations omitted) (citing *Strickland, Porter*, and *United States v. Fahey*, 769 F.2d 829, 836 (1st Cir.1985)).

In applying *Smith* to the facts presented in *Freund*, the Eleventh Circuit noted that, "[a]lthough *Smith* speaks of a 'witness,' we find no reason not to extend its rule to non-testifying, separately-tried co-defendants (*e.g.,* Trent)." *See Freund*, 165 F.3d at 859, n. 31. The Eleventh Circuit found that Freund had failed to establish either an actual conflict or, even assuming one, an adverse effect on his representations stemming from his counsel's prior representations of Trent or Mills. *See Id.* at 862–69.

The Eleventh Circuit's current understanding of *Sullivan*—as evidenced by, *inter alia, Porter, Smith,* and *Freund*—can therefore be summed up as follows. A petitioner can demonstrate that an actual conflict of interest adversely affected his representation under two distinct sets of circumstances: (1) where petitioner's counsel concurrently represented ("concurrent" encompassing not only joint representations in the same matter, but also temporally overlapping representations in unrelated matters) the petitioner, on the one hand, and either a co-defendant of, or prosecution witness against, the petitioner, on the other; or (2) where petitioner's counsel successively represented ("successive" understood as not temporally overlapping) petitioner and either a co-defendant of, or prosecution witness against, the petitioner. In both contexts, the petitioner must demonstrate two elements: (1) actual conflict and (2) adverse effect. In both contexts, to establish an actual conflict of interest, a petitioner must point to specific instances in the record demonstrating that petitioner's counsel had to choose between "inconsistent interests"—*i.e.,* a choice between possible alternative courses of action that would have inured to one client's benefit and another client's detriment, or vice versa. *See Reynolds v. Chapman,* 253 F.3d 1337, 1343 (11th Cir.2001) (citing *Smith,* 815 F.2d at 1404); *see supra* at 1379. In both contexts, a petitioner must establish that the actual conflict of interest adversely affected his representation—i.e., that his counsel might have pursued a alternative, reasonable trial strategy or tactic and did not because doing so conflicted with his external loyalties. *See Reynolds,* 253 F.3d at 1343 (citing *Freund,* 165 F.3d at 860); *see supra* at 1380. In the successive representation context, however, a petitioner has the additional burden, in order to establish an actual conflict of interest, of demonstrating, at a minimum, either a substantial, particular relationship between the successive representations or the learning of confidential information in the prior representation that was relevant to the subsequent representation. *See Freund,* 165 F.3d at 859; *Smith,* 815 F.2d at 1405–06.

This Court notes, however, that the Supreme Court, in its March 2002 opinion in *Mickens v. Taylor,* called into question the integrity of the post-*Sullivan* superstructure constructed in this and other circuits. An examination of *Mickens* is therefore essential here. The petitioner in *Mickens v. Taylor,* Walter Mickens ("Mickens"), was convicted of premeditated murder. *See Mickens,* —— U.S. at ——, 122 S.Ct. at 1239. In his habeas corpus petition, Mickens argued that one of his court-appointed attorneys, Bryan Saunders ("Saunders"), had labored under an actual conflict of interest at trial because Saunders had previously represented Mickens's victim, Timothy Hall ("Hall"), on unrelated assault and concealed weapons charges. *Id.* at 1240. Saunders was appointed to repre-

sent Hall on March 20, 1992, and Saunders met with Hall on one occasion for 15 to 30 minutes between March 20 and March 30, 1992, when Hall's body was found. *Id.* The charges against Hall were dismissed on April 3, 1992, the presiding court noting on the docket that the defendant was deceased. *Id.* Saunders was appointed to represent Mickens on April 6, 1992. *Id.* Neither Mickens nor Saunders's co-counsel were aware that Saunders had represented Hall, and Mickens did not object to Saunders's representation prior to trial. *Id.*

The Fourth Circuit, sitting en banc, relied on *Sullivan* and held that Mickens had to show *"both* an actual conflict of interest and an adverse effect even if the trial court failed to inquire into a potential conflict about which it reasonably should have known." *Mickens,* 122 S.Ct. at 1240 (quoting *Mickens v. Taylor,* 240 F.3d 348, 355–56 (4th Cir.2001) (en banc)) (emphasis added). The Fourth Circuit concluded that Mickens had demonstrated an actual conflict but had failed to demonstrate an adverse effect on his representation therefrom, and affirmed the district court's denial of habeas relief. *Id.* The Supreme Court granted certiorari to address "what a defendant must show in order to demonstrate a Sixth Amendment violation where the trial court fails to inquire into a potential conflict about which it knew or reasonably should have known." *Mickens,* — U.S. at ——, 122 S.Ct. at 1239.

In *Mickens* the Supreme Court clarified two issues germane to this Court's analysis of the Petition. First, even if a trial court fails to inquire into a potential conflict of interest about which it knew or reasonably should have known, a petitioner alleging, on collateral review, a Sixth–Amendment, ineffective-assistance-of-counsel violation premised on such conflict must nevertheless demonstrate that the conflict was an actual conflict that adversely affected his counsel's representation. *See Mickens,* —

U.S. at ——, 122 S.Ct. at 1245. A district court's failure to inquire under such circumstances does not therefore entitle the petitioner to automatic relief.

Second, the Supreme Court made clear that "the *Sullivan* standard is not properly understood as requiring inquiry into actual conflict as something separate and apart from adverse effect. *An actual conflict for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." Id.* at 1244, n. 5 (emphasis added). The *Sullivan*-mandated inquiry is therefore a one-part inquiry—that is, an inquiry into the "adverse effect" of a conflict of interest—not a two-part inquiry.

In addition to these two express clarifications, the Supreme Court also stated the following about the application of *Sullivan* to cases other than those involving joint, concurrent representations:

Lest today's holding be misconstrued, we note that the only question presented was the effect of a trial court's failure to inquire into a potential conflict upon the *Sullivan* rule that deficient performance of counsel must be shown. The case was presented and argued on the assumption that (absent some exception for failure to inquire) *Sullivan* would be applicable—requiring a showing of defective performance, but not requiring in addition (as *Strickland* does in other ineffective-assistance-of-counsel cases), a showing of probable effect upon the outcome of trial. That assumption was not unreasonable in light of the holdings of Courts of Appeals which have applied *Sullivan* unblinkingly to all kinds of alleged attorney ethical conflicts. They have invoked the *Sullivan* standard not only where (as here) there is a conflict rooted in counsel's obligations to *former* clients, but even when representation of

the defendant somehow implicates counsel's personal or financial interests ....
*Mickens,* —— U.S. at ——, 122 S.Ct. at 1245 (internal quotations and citations omitted) (emphasis original).

The Supreme Court continued, "[i]t must be said, however, that the language of *Sullivan* itself does not clearly establish, *or indeed even support,* such expansive application." *Id.* (emphasis added). The Supreme Court emphasized *Sullivan's* language that, "[u]ntil a defendant shows that his counsel *actively represented* conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Id.* (quoting *Sullivan,* 446 U.S. at 350, 100 S.Ct. 1708) (emphasis added in *Mickens* ). The Supreme Court also cited Fed.R.Crim.P. 44(c)— which requires a trial court to inquire into potential conflicts of interest in joint, concurrent representations, but not successive representations involving substantially related matters—as another instance in which the judicial system treats the circumstances differently. *Id.* at 1245–46. While acknowledging that an attorney's ethical duties are no more or less important in the two circumstances, the *Mickens* Court stated that, "the purpose of our ... *Sullivan* exception[ ] from the ordinary requirements of *Strickland* is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." *Id.* at 1246 (citing *Nix v. Whiteside,* 475 U.S. 157, 165, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986)). Despite all of the forgoing commentary, the Supreme Court nevertheless left unaddressed the question of whether *Sullivan*

does in fact apply to cases involving successive representations. *Id.*

This Court's research has revealed only two cases, as of the time of the drafting of this Order, in the Eleventh Circuit that have cited *Mickens v. Taylor:* (1) *Brownlee v. Haley,* 306 F.3d 1043, 1064 n. 17 (11th Cir.2002) (quoting *Mickens,* —— U.S. at ——, 122 S. Ct. at 1245 as the standard for assessing conflicts of interest on collateral review and citing *Freund* for the test regarding "adverse effect") and (2) *Hernandez v. Spears,* No. 00–3059, 2002 WL 1205058 at *5 (S.D.Fla. May 9, 2002) (quoting *Mickens,* —— U.S. at ——, n. 5, 122 S.Ct. at 1244, n. 5, and stating that *Mickens* rejected the conceptual separation between "actual conflict" and "adverse effect"). This Court therefore finds itself in at least partially unchartered waters, without full Eleventh Circuit guidance regarding the extent to which its *Sullivan*-related jurisprudence has been modified by *Mickens.*

■ Because (1) the question addressed by the Supreme Court in *Mickens* was "what a defendant must .show in order to demonstrate a Sixth Amendment violation where the trial court fails to inquire into a potential conflict about which it knew or reasonably should have known" *Mickens,* —— U.S. at ——, 122 S.Ct. at 1239, and (2) five justices joined in the majority-opinion [6] addressing that question, this Court has determined that it is compelled to follow *Mickens* and reject the conceptual distinction between "actual conflict" and "adverse effect" articulated in the Eleventh Circuit's line of cases, including *Smith v. White, Freund v. Butterworth,* and *Reynolds v. Chapman.*

---

**6.** Justice Scalia wrote the opinion for the Court in which Justices Rehnquist and Thomas joined. Justice Kennedy wrote a concurring opinion, in which Justice O'Connor joined, where he expressly joined the Court's opinion in full, and stated that he wrote separately only to opine on a question upon which the Court had not granted certiorari.

This Court will reconcile the Supreme Court's rejection of this conceptual distinction with the existence of independent tests for determining "actual conflict" and "adverse effect" in the Eleventh Circuit in the following manner. This Court will find the constitutional predicate for habeas relief if Petitioner can demonstrate that O'Donnell (1) concurrently or successively represented Petitioner and Rendina, and (2) O'Donnell's representation of those two individuals created a conflict of interest that "adversely affected" O'Donnell's representation of Petitioner, using the Eleventh Circuit's standard for determining "adverse effect." In other words, because, as the Supreme Court has stated, "[a]n actual conflict for Sixth Amendment purposes, *is* a conflict of interest that adversely affects counsel's performance," *Mickens* at 1244, n. 5 (emphasis added), this Court adopts the rule that if (1) a petitioner's counsel represented the petitioner and another person[7], and (2) the petitioner can establish that the two representations created a conflict of interest that "adversely affected", as defined by the Eleventh Circuit, counsel's representation of petitioner, then the petitioner will be entitled to relief under the Sixth Amendment. This rule accords the fullest possible respect to the law of both the Supreme Court and the Eleventh Circuit on this issue. In addition, because the Supreme Court expressly reserved the question of whether *Sullivan* applies to successive representation cases—the Justices' critique of such application of *Sullivan* notwithstanding—this Court has determined that it is compelled to follow the Eleventh Circuit's pronouncements on the applicability of *Sullivan* in such cases, including those pronouncements in *Porter, Smith* and *Freund.*

One potential objection to the rule adopted by this Court is that the rule might neglect the distinction the Eleventh Circuit has drawn—in, *inter alia, Smith* and *Freund*—between concurrent and successive representation cases. The Eleventh Circuit has held that petitioners in successive representation cases must establish, at a minimum, either a substantial relationship between the representations or the learning of relevant confidential information in the prior representation to meet the test for "actual conflict". *See supra* at 1379, 1380. One might therefore object that this Court's rule, by reducing the inquiry to an analysis of the case under the Eleventh Circuit's "adverse effect" test, will open the door for a petitioner to use his counsel's prior representation of another person in a wholly unrelated matter as a basis for habeas relief.

The Court believes such an objection would be ill-founded. As noted *supra* at 1380–81, the Eleventh Circuit's test for determining adverse effect is the following:

> To prove adverse effect, a habeas petitioner must satisfy three elements. First, he must point to "some plausible alternative defense strategy or tactic that might have been pursued." Second, he must demonstrate that the alternative strategy or tactic was reasonable under the facts.... Finally, he must show some link between the actual conflict and the decision to forgo the alter-

---

**7.** The Court notes that in the jurisprudence of the Supreme Court and Eleventh Circuit the other "person" has been one of the following: a separately-tried, non-testifying co-defendant of the petitioner (*e.g., Sullivan* and *Freund* ); a testifying witness against the petitioner (*e.g., Porter* and *White* ); and a victim of the petitioner's crime (*e.g., Mickens* ). Rendina was none of the above, but rather a potential witness who was never called for or against Petitioner. Because Petitioner argues that O'Donnell's decision not to call Rendina is the essential basis of the "adverse effect" on O'Donnell's representation of Petitioner, the Court rules that *Sullivan* and its progeny ought to apply to this case.

native strategy of defense. In other words, "he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."

*Freund,* 165 F.3d at 860; *see also, Reynolds,* 253 F.3d at 1343 (citing *Freund*). Requiring petitioners to satisfy the third element of Eleventh Circuit's "adverse effect" test will fully ensure that petitioners in successive representation cases demonstrate the requisite nexus between the prior representation and the representation of the petitioner. Such a petitioner, like petitioners in concurrent representation cases, must prove a link between his counsel's representation of another person and his counsel's decision to forgo a reasonable, alternative trial strategy or tactic. Or, otherwise stated, petitioners must prove that the representations were "inherently in conflict." This element of the Eleventh Circuit's "adverse-effect" test fully ensures that all petitioners (those in both concurrent and successive representation cases) will be required to meet a standard consistent with that required by the Eleventh Circuit's pre-*Mickens,* two-part inquiry into "actual conflict" and "adverse effect." The Court cannot envision a case in which a petitioner in a successive representation case could successfully prove all three elements of the Eleventh Circuit's "adverse effect" test and not also be able to satisfy the Eleventh Circuit's pre-*Mickens* test for "actual conflict" in successive representation cases. In short, requiring a petitioner to prove (1) his counsel represented another person and (2) that representation created to a conflict of interest that "adversely affected" his counsel's representation of petitioner is a clear rule that is consistent with both the Supreme Court's decision in *Mickens* and the Eleventh Circuit's decisions in *Smith* and Freund.

Having determined what standard the Court ought to apply to the instant Petition, this Court now turns to the particular issues raised by it. In light of the forgoing, there are two questions this Court must resolve in addressing the Petition: (1) Did O'Donnell ever represent Rendina?; and (2) if so, has the Petitioner demonstrated that the representation created a conflict of interest that "adversely affected" O'Donnell's representation of Petitioner.

■ Regarding the first question, this Court finds that O'Donnell never represented Rendina. The record is clear that O'Donnell and Rendina were and are close personal friends. The two routinely discussed, as friends, Rendina's various legal problems, and O'Donnell offered Rendina his advice about the same. And, O'Donnell did sign three pleadings filed on Rendina's behalf in Rendina's tax case, including one that argued for early termination of Rendina's supervised release—based, in part—on Rendina's involvement in the events that led to Petitioner's arrest.

■ But, O'Donnell has never entered a notice of appearance on behalf of Rendina, and Rendina has never retained O'Donnell as an attorney. Rendina also testified that O'Donnell may well have signed the pleadings as a personal favor to Rendina and at the direction of Rendina's counsel in that case. Moreover, and most important, Rendina testified unequivocally that he has never considered O'Donnell to be his attorney. *See supra* at 1376. This is crucial. Under Florida law, the test for determining whether an attorney-client relationship exists is a subjective one, and "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention is to seek professional advice." *Florida Bar v. Beach,* 675 So.2d 106, 109 (Fla.1996) (citations and internal quotations admitted); *see also, Keepsake, Inc. v. P.S.I. Indus.,* 33 F.Supp.2d 1033, 1036 (M.D.Fla.1999) (citing *Beach*). Rendina

routinely consulted with O'Donnell as his friend, but never as his attorney. Therefore, no attorney-client relationship has ever existed between them, and O'Donnell therefore never represented Rendina. Logic dictates that, if O'Donnell has never represented Rendina, O'Donnell never actively represented Petitioner and Rendina, either concurrently or successively. O'Donnell therefore could not have labored, and did not labor, under a conflict of interest for Sixth–Amendment purposes. *See Mickens,* —— U.S. at ——, 122 S.Ct. at 1245, and *Sullivan,* 446 U.S. at 350, 100 S.Ct. 1708. Because the Petitioner has failed to establish this essential predicate to his entitlement to relief, the Petition must be denied.[8]

■ Even assuming that Petitioner could demonstrate that O'Donnell had represented both Petitioner and Rendina, which Petitioner cannot do and has not done, Petitioner would not be able to establish that doing so led to an actual conflict of interest, that is, a conflict that adversely affected O'Donnell's representation of Petitioner. Assuming for the sake of argument only, that the consultations between O'Donnell and Rendina regarding Rendina's tax case throughout the pendency of that case constituted an attorney-client relationship, and, therefore, that O'Donnell concurrently represented Petitioner and Rendina, Petitioner would nevertheless not be entitled to relief.

Petitioner argues that O'Donnell's decision not to call Rendina as a witness ultimately forced O'Donnell to put Petitioner on the witness stand in his own defense so that O'Donnell could elicit sufficient testimony for this Court to give the jury an instruction on entrapment. Petitioner argues that this adversely affected Petitioner's representation. Petitioner's argument fails for several reasons.

In order to prove adverse effect Petitioner must establish: (1) that O'Donnell might have pursued an alternative trial strategy or tactic; (2) that the alternative was *reasonable* under the circumstances; and (3) that O'Donnell did not pursue it because doing so conflicted with his external loyalty to Rendina. *See Reynolds,* 253 F.3d at 1343 (citing *Smith,* 815 F.2d at 1404). Again, assuming for the sake of argument only that O'Donnell had represented Rendina, Petitioner could not satisfy the Eleventh Circuit's adverse effect test.

Calling Rendina as a witness was not a *reasonable* alternative for O'Donnell. The Government had extensive evidence—including, among other things—audio recordings from Petitioner's meetings with Collazo establishing that Petitioner had knowingly taken part in a transaction to purchase a large quantity of cocaine. Petitioner was arrested in the midst of the reverse-sting operation. This was clearly not a case of mistaken identity. The only colorable theory of defense O'Donnell

---

8. It must be said, in addition, that contrary to Judge Vitunac's finding in the R & R (*see supra* at 1376) nothing in either the Supreme Court's or Eleventh Circuit's jurisprudence regarding this issue suggests that a personal relationship, however intimate—as opposed to an attorney-client relationship, concurrent or successive—can give rise to a conflict of interest for a Sixth–Amendment, ineffective-assistance-of-counsel claim. This rule of law is not only made clear by Supreme Court's

and Eleventh Circuit's decisions, but it is also sound public policy. Given the close-knit nature of many legal communities—in small- and moderately-sized towns, as well as some larger ones—precluding defense counsel from representing defendants when counsel have a personal, as opposed to an attorney-client, relationship with a co-defendant, a witness or a potential witness would not advance the purpose of the Sixth Amendment's right to counsel, which is to ensure that defendants receive fair trials.

could argue for Petitioner was a defense of entrapment. O'Donnell knew full well from his conversations with Rendina that Rendina's testimony would have completely undermined the only theory of defense available to Petitioner. Knowing this, calling Rendina as a witness would have been foolhardy, not reasonable.

O'Donnell instead attempted to put before the jury a theory of defense that Rendina had induced Lombardo to engage in a cocaine transaction by holding out the Panamanian gaming venture as an investment opportunity. O'Donnell was able, in cross-examining Collazo and Special Agent Scott, to put before the jury Rendina's many motives for attempting to entrap Petitioner, and O'Donnell spared no aspect of Rendina's personal reputation in the process. O'Donnell also attempted to insinuate over and over again that Rendina had induced Petitioner to engage in the drug transaction in meetings not monitored by the DEA. The surest way for O'Donnell to shatter the theory he was advancing would have been to call as a witness the person upon whom O'Donnell was pinning the entrapment, *in absentia,* and have that person testify that Petitioner had eagerly discussed a drug transaction with him. Instead, O'Donnell assassinated Rendina's character, blamed him for the entrapment, and never gave Rendina the opportunity to undermine the theory.

Petitioner likewise could not prove that O'Donnell's decision not to call Rendina as a witness was owing to any external loyalty to Rendina. As noted, O'Donnell showed no compunction about attacking Rendina's character at Petitioner's trial. In addition, that O'Donnell did not call Rendina because doing so would have undermined Petitioner's defense and not because of any loyalty to Rendina is made clear by the fact that O'Donnell did not call Roussonicolos as a witness either. Roussonicolos was also present with Rendina

for the one meeting Rendina had with Petitioner. O'Donnell had no significant relationship with Roussonicolos whatsoever, personal or professional. If O'Donnell had determined that attempting to elicit testimony of what transpired at Rendina's meeting with Petitioner would have supported the entrapment defense, O'Donnell could have called Roussonicolos. But, Roussonicolos, like Rendina, had informed O'Donnell that his testimony would not support an entrapment defense. The record is clear that O'Donnell did not call Rendina because doing so would not have been a reasonable trial tactic, not because of any conflicting loyalty O'Donnell felt toward Rendina. Therefore, even assuming that Petitioner could demonstrate that O'Donnell had ever represented Rendina, Petitioner could not establish that such a hypothetical representation created an actual conflict of interest that adversely affected O'Donnell's representation of Petitioner.

## IV. Conclusion.

This Court has determined that, under the law of the Eleventh Circuit understood in light of the Supreme Court's decision in *Mickens v. Taylor,* Petitioner was required to demonstrate that his trial counsel, John O'Donnell, had represented Richard Rendina and that the representation created a conflict of interest that adversely affected O'Donnell's representation of Petitioner. Petitioner has failed to demonstrate that O'Donnell has ever represented Rendina, and even if Petitioner could demonstrate such a representation, Petitioner could not demonstrate that such a representation created an actual conflict of interest that adversely affected O'Donnell's representation of Petitioner.

Again, the Court has adopted in full those portions of the Magistrate's Report

& Recommendation that recommended denying the Petition on Petitioner's other two argued bases for relief. Having found the remaining argued basis for relief to be without merit, the Court **ORDERS AND ADJUDGES** that the Petition is **DENIED**.